UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,                    Criminal Case No. 3:10-CR-506-(1,2)-KI

                        Plaintiff,               OPINION AND ORDER ON
                                                 POST-TRIAL MOTIONS

    v.

**HOSSEIN LAHIJI; NAJMEH VAHID;
AND AHMAD IRANSHAHI, a.k.a.
"Farhad,"**

                    Defendants.

      S. Amanda Marshall
      United States Attorney
      District of Oregon
      Charles F. Gorder, Jr.
      David L. Atkinson
      Assistant United States Attorneys
      1000 SW Third Ave., Suite 600
      Portland, OR 97204-2902

        Attorneys for Plaintiff

Page 1 - OPINION AND ORDER ON POST-TRIAL MOTIONS

Michael W. McCrum
700 N. St. Mary's Street
Suite 1900
San Antonio, TX 78205

   Attorney for Defendant Lahiji

Erich Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004

Per A. Ramfjord
Stoel Rives LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204

   Attorneys for Defendant Vahid

KING, Judge:

   A jury convicted defendants Hossein Lahiji and Najmeh Vahid of conspiracy to defraud the United States and conspiracy to transfer funds overseas to promote a violation of the Iranian embargo.  Pending before me are defendants' Motion to Compel Disclosure and Witness Immunity and Joint Motion for New Trial.  For the following reasons, I deny both motions.

## BACKGROUND

   The first count of the two-count indictment alleged a "<u>Klein</u>" conspiracy–that defendants defrauded the United States by "impeding, impairing, obstructing, and defeating" the Office of Foreign Assets Control ("OFAC") in the administration and enforcement of the Iranian embargo (imposed pursuant to the International Economic Emergency Powers Act–"IEEPA").

Indict. ¶ 12(1); United States v. Klein, 247 F.2d 908, 915 (2d Cir. 1957).  It also charged

defendants with defrauding the United States by "impeding, impairing, obstructing, and

defeating" the IRS "by deceitful or dishonest means in the oversight of organizations exempt

from income tax under Section 501(c)(3) of the Internal Revenue Code and in the ascertainment,

computation, assessment and collection of the revenue, that is, income taxes[.]"  Indict. ¶ 12(2).

The second count charged defendants with conspiracy to commit money laundering.

Specifically, they were charged with transporting, transmitting, and transferring monetary

instruments and funds from a place in the United States to and through a place outside the United

States with the intent to promote the carrying on of specified unlawful activity–a violation of the

Iranian embargo.  Id. at ¶ 21.

The parties are familiar with the background of this case.  Accordingly, I reference below

only those facts that are relevant to the pending issues.

## DISCUSSION

I.    Defendants' Motion to Compel Disclosure and Witness Immunity

This case involves funds the defendants sent to co-conspirator Child Foundation and its

Iranian counterpart, Refah Kudak, through Child Foundation's president and registered agent

Mehrdad Yasrebi.  Both Child Foundation and Yasrebi were indicted and convicted before

defendants' case went to trial.

On May 30, 2013, Yasrebi informed me through his attorney that he intended to plead the

Fifth Amendment should he be called to testify in defendants' trial.  The government did not

intend to call Yasrebi as a witness.  Since Yasrebi intended to invoke the Fifth Amendment,

defendants sought to introduce Yasrebi's testimony from his February 20, 2013 immigration

deportation proceedings.  I ruled the transcript was admissible.  After multiple discussions with the government about proposed redactions, defendants decided not to introduce the testimony.

     A.     <u>Compel Disclosure</u>

After trial, defendants learned a government agent had interviewed Yasrebi, after the first day of his deportation hearing, and had subjected him to a polygraph examination.  Following the interrogation, the deportation proceedings were dismissed without prejudice.

Defendants speculate about the subject matter of the interview and polygraph examination, believe it to be exculpatory evidence, believe it explains Yasrebi's "sudden and unexpected decision to not cooperate with the Lahijis at their trial," and demand access to the information.  Defs.' Mot. to Compel 5.

In response, the government provided a summary of the information defendants sought, including a sealed copy of the polygraph report.  It also provided a declaration from the interviewing agent, Adam Burtt, who is a Special Agent of the United States Homeland Security Investigations.  He explains he routinely interviews detainees housed at the Tacoma Immigration Detention Center.  The declaration and polygraph report clearly reflect Agent Burtt's contact with Yasrebi had nothing to do with this case and that Agent Burtt was unaware Yasrebi was a potential witness.  As a result, this part of defendants' motion is moot.

In their reply, defendants appear to recognize the motion is moot, but request that I disclose any material I believe to be subject to disclosure.  They give no reason why the information should be disclosed, and I decline to do so.

B.    Use Immunity

Defendants also ask me to compel the government to grant Yasrebi "use and derivative use" immunity.  They contend that by interviewing Yasrebi, the government effectively kept Yasrebi from testifying.

Under the analysis in United States v. Straub, 538 F.3d 1147 (9th Cir. 2008), which calls for a two-part test, defendants' argument fails.  First, the witness must possess relevant information.  Id. at 1157.  The government concedes defendants meet the first prong, but dispute they meet the second which requires deliberate action on the part of the government to "distort[] the fact-finding process."  Id.  The government's deliberate intention can be shown either by demonstrating it granted immunity to a government witness while denying immunity to a defense witness, or it caused a defense witness to invoke the Fifth Amendment by taking affirmative steps to prevent him from testifying.  Since the government did not grant immunity to any witness, only the latter analysis is implicated.  Accordingly, defendants must show the prosecution used a deliberate strategy to discourage Yasrebi from testifying.  "The prosecution's conduct must amount to a substantial interference with the defense witness's free and unhampered determination to testify[.]"  Id. at 1158.

As an initial matter, defendants represent now that Yasrebi's "refusal to testify was not anticipated in the months leading up to trial and did not appear justified in light of his having been sentenced," that "it was expected [he] would be available for testimony," and that "he was a critical potential defense witness."  Defs.' Mot. to Compel 2, 4.  These are puzzling statements. Four months before trial, David Angeli, an attorney whom Vahid wished to retain for trial but who had also represented Yasrebi in his guilty plea and sentencing, and about whom I had

conflict concerns, informed me defendants did not intend to call Yasrebi as a witness. Telephone

Status Conf., Tr. 12 (Feb. 14, 2013), ECF 294.[1]

In any event, the record is clear now, from the government's sealed and public material,

that if Agent Burtt could be considered part of the prosecution, he knew nothing of this criminal

case and had nothing to do with Yasrebi's decision to invoke the Fifth Amendment. Since

defendants are unable to point to any evidence that the government deliberately intended to

distort the fact-finding process or cause Yasrebi to invoke the Fifth Amendment, the motion to

compel is denied.

## II.    Defendants' Joint Motion for New Trial

Defendants seek a new trial on the basis of two theories. They first argue the government

saturated the trial to their detriment with talk of the Islamic Republic of Iran, Ayatollah Shirazi,

Hezbollah, and defendants' loyalty to Iran. They also argue newly discovered evidence refutes

the alleged illegality of their transactions in Iran.

Pursuant to Federal Rule of Criminal Procedure 33(a), "Upon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires." In

considering whether to grant a new trial, a district court is not required to view the evidence in

---

[1]THE COURT: . . . When Mr. Yasrebi takes the stand and has to – well– well, answer questions, who knows what could occur at that point, and I –

MR. ANGELI: Thank you. Your Honor, to that I will say two things: One, I have asked this question at least four times to the Government, and they have assured me – not that they don't think they will call Dr. Yasrebi, but, for reasons they can't disclose to me, they cannot call him –

THE COURT: Well, wait a minute, counsel . . . . What about you? Are you going to call him?

MR. ANGELI: Nor would we call him. And I will say, Your Honor, to the extent that we ever would, I made clear to him, again, in writing, I would not do the questioning.

the light most favorable to the verdict.  The court may weigh the evidence and evaluate the

credibility of the witnesses.  United States v. A. Lanoy Alston, D.M.D., P.C., 974 F.2d 1206,

1211 (9th Cir. 1992).  "If the court concludes that, despite the abstract sufficiency of the evidence

to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a

serious miscarriage of justice may have occurred," the court may set aside the verdict and grant a

new trial.  Id. at 1211-12 (internal quotation omitted).

Prejudicial statements made by the government may be so prejudicial to a defendant's

substantial rights as to warrant a new trial.  United States v. Weatherspoon, 410 F.3d 1142, 1150

(9th Cir. 2005).  The Court should look to the "substance of the curative instruction" and the

"strength of the case."  Id. at 1151.

A.      Government Misconduct

1.      Pretrial Proceedings

Prior to trial, defendants moved in limine to "exclude all prejudicial and inflammatory

testimony pertaining to terrorism" and to strike similar language from the Indictment.  Defs.'

Mot. in Limine 2-4 (May 7, 2013), ECF 212; Defs.' Mot. to Strike Surplusage from Indictment

(July 5, 2012), ECF 96.  I held a pretrial conference on May 28, 2013.  At that time, I generally

noted,

> There's an awful lot of issues in this case.  A lot of evidence.  A lot of documents.
> A lot of experts.  We'll try and resolve as many problems as we can; but, frankly,
> we may end up, in this case, trying the case like we used to try cases, and that's
> somebody offers some evidence, an exhibit or witness, and then there's an
> objection, then the judge decides it, and you go on from there.

Tr. 9 (May 28, 2013).[2]  I also initially ruled the government was entitled to bring out some

background about Ayatollah Shirazi and his support of Hezbollah.  Id. at 27.  When defendants

moved to strike all evidence related to Ayatollah Shirazi, I indicated I would have to review the

material and hear the evidence, but would not make a decision pretrial.  Id. at 73.

      The next day, I issued a minute order reflecting my rulings from the pretrial conference.

In the minute order, I instructed the government to "advise the Court before offering evidence

about Ayatollah Shirazi."  Minute Order (entered May 29, 2013), ECF 234.  On May 30, during a

telephone conference with the attorneys and defendants, the government notified me it intended

to refer to Ayatollah Shirazi in its opening statement, and that its first witness would be testifying

about Ayatollah Shirazi.  Tr. 14 (May 30, 2013), ECF 319.  I instructed the government it could:

> talk about who he is in your opening statement.  But as far as getting into details
> about his involvement or potential involvement or the possibility of involvement,
> I would say I want to hear the evidence on that before I allow it in.  So you can
> make a general statement about him in your opening statement, but before you
> start putting on witnesses to talk about what he did or didn't do or possibly could
> have done, you'll have to take that up with the Court.

Id. at 15.  The government underscored it was "central" to the case that defendants sent money

through the Child Foundation for the benefit of Ayatollah Shirazi to pay religious taxes, which is

a violation of the embargo and an improper tax deduction.  I explained I did not want the

government getting into Hezbollah.  The government indicated it would "keep that in mind, and

I'll bring that up with the Court before Mr. Khalaji testifies.  But he will be our first witness."  Id.

at 16.  I then stated:

>       Well, I understand you're going to be putting on some testimony.  I just
> want to know what that testimony is, how strong it is.  I'm going to have to, I'm

---

[2]Any transcript citations which do not reference ECF have not yet been filed on ECF.

sure, make a determination of whether the prejudice–excuse me–of whether the probative value is outweighed by the prejudice.  I can't make that decision until I hear the testimony.  And so it may well be that you're going to be allowed to put on some testimony, but it may well be that it –well, I'm not going to make any decisions at this point as to how far we go on it and whether the testimony will stay in the case or whether the jury will be instructed to disregard what they've heard on that subject.

So that's an open issue.  You can talk about him generally in your opening statement.  You can put on evidence or attempt to put on evidence, but we'll have a conference before you do it.

Id.

2.    Opening Statement

Before opening statements and testimony the first day of trial, out of the presence of the jury, I engaged in a further colloquy with the government about the subject:

MR. GORDER:  Your Honor, I think in our last telephone conference, you asked me not to talk about the terrorist group Hezbollah, and I won't.  I am going to mention Ayatollah Shirazi.  He's key to the case.

THE COURT:  All right.  I will allow that.  You can mention Ayatollah Shirazi.

Tr. 33 (June 12, 2013).

The government also indicated it would mention a few other ayatollahs.  I said, "All right."  Id. at 34.

The government then gave its opening statement, during which it periodically showed a demonstrative exhibit with pictures of Ayatollah Shirazi next to pictures of the defendants.  It also stated the evidence would show Lahiji was in the United States to make as much money as he could and then he would return to Iran.

Page 9 - OPINION AND ORDER ON POST-TRIAL MOTIONS

3.      Witnesses

a.      Mehdi Khalaji

The government called its expert on Iran, Mehdi Khalaji, as its first witness. Khalaji testified about the governance of Iran, the role of ayatollahs, the payment of taxes to them, how ayatollahs can divert money, and Ayatollah Shirazi's background. During direct examination, the government asked how ayatollahs might use the religious taxes.

Q.      How about military-type organizations?

A.      If they think it's necessary, yes. For example, Ayatollah Khomenei, the founder of Islamic Republic, has authorized khoms to be – part of the khoms to be given to MEK, which at that time was an opposition armed group fighting against shah. So we know that some ayatollahs, if they believe that this–because the cause of this organization is religiously legitimate, even if their cause is totally political, they would help them financially.

Q.      Is it possible they could deliver money to terrorist groups?

A.      Obviously if they pay money or they authorize giving money to any organization, they would not consider it a terrorist group. They would consider it a group which is fighting for a religiously legitimate cause.

Q.      How about Makarem Shirazi? Is he known for giving money to groups that we would consider terrorists?

A.      There is no proof for that, at least as far as I know. But he has an office in – in the south of Beirut that is in a Hezbollah neighborhood. And those offices who work there, you know, they might be involved in some of the financial activities that help Hezbollah, but there is no hard proof for that.

Tr. 106-07 (June 12, 2013).

After the lunch recess, defense counsel objected to the line of questioning. I noted there had been no objections during the testimony, and suggested a couple of options. I could tell the jury to disregard the testimony, but that would reinforce the testimony in their minds. Or

Page 10 - OPINION AND ORDER ON POST-TRIAL MOTIONS

defendants could move for a mistrial, which I indicated I would not grant.  I reminded Gorder

my ruling was not to go into Hezbollah without previously alerting me.  Gorder responded with,

"I'm sorry, Your Honor.  I tried to keep it down to a real dull – you know, this witness– well,

anyway, I apologize.  I'll just leave [it] at that."  Id. at 119.  I asked defense counsel what they

wanted to do about it; they did not request an instruction.

> b.    Kimberly Price

Several days later, the government called Special Agent Kimberly Price, a witness

familiar with the investigation into the Child Foundation.  During a recess from defense

counsel's cross-examination of Price, and out of the presence of the jury, the government

informed me it believed defense counsel had "opened the door to the question of Makarem

Shirazi's connections with the Hezbollah terrorist group" by asking Agent Price whether she

found evidence of improper use of the funds.  Tr. 1221 (June 18, 2013).

The following colloquy then took place:

> THE COURT:  I'm not going to rule on that.  I think it's not open.  It's
> very, very close to having been opened.

> You can go ahead and ask your questions.  We'll see where we go at that
> point.

> MR. McCRUM:  Judge, so I can complete – May I respond, Judge?

> THE COURT:  Go ahead.

> MR. McCRUM:  I am responding to what he has done through his
> witnesses to some extent, Judge.  It's not opening the door on my own volition.  It
> is a response to his questions, of what he has done, through his witnesses.  We've
> already complained to the Court about this, that he violated the Court's rule.  And
> so it was a question designed to that.  It was not opening the door to any new
> matter.  It was merely a response to his questions.

Page 11 - OPINION AND ORDER ON POST-TRIAL MOTIONS

THE COURT:  Well, I'll have to review, in my mind, what has been said. I'll review the information– excuse me.  I'll review the information and I'll make a decision on that, assuming that he asks the questions after you finish with your witness.

MR. McCRUM:  Well, that's why I'm bringing it up, Judge.  I don't want him asking the questions.

THE COURT: I know you don't.  But he's going to have to make that decision.  I'm going to have to make the decision if you do.  I'm not ruling right now that anything has occurred that opens the door.  I'm saying I'm concerned about it.

MR. McCRUM:  Then I'm moving in limine that he not be able to ask the question.

THE COURT:  I'm not allowing that.  I'm going to have to determine just what question he asked and review what evidence has been received and review the questions you asked, many of which contain statements.  And I will do that when I hear the questions he asks.

So I'm not going to rule on the motion in limine.

MR. McCRUM:  I would then ask for an offer of proof outside the presence of the jury of what his questions would be before he presents those questions to the jury.

THE COURT:  All right.  We'll do that.

Okay.  We'll be in recess.

Id. at 1221-23.  After returning from recess, with the jury again present, defense counsel concluded his cross-examination of Price.  Some time into the government's re-direct, the following exchange occurred:

Q.  You were asked a series of questions about what evidence you had uncovered concerning the funds going to Makarem Shirazi.

A.  Yes, I was.

Q.  Do you recall those questions?

A.  Yes.

Q.  And in the course of your investigation, did you learn where Makarem Shirazi might be sending money?

A.  Yes, I did.

Q.  And where would that be?

      MR. McCRUM:  Objection, speculation.

      THE COURT:  Sustained.

BY MR. GORDER:  (continuing)

Q.  Did you learn about groups that Makarem Shirazi indicated in public pronouncements that he supported?

      MR. McCRUM:  Objection.

      THE COURT:  Overruled.

      THE WITNESS:  According to newspaper articles and public information, Makarem Shirazi was a vocal supporter of Hezbollah and the people of Lebanon.

BY MR. GORDER:  (continuing)

Q.  And Hezbollah being what?

A.  A terrorist group out of Lebanon.

      MR. McCRUM:  Objection, ask to strike.

      THE COURT:  Yes.  I'm going to instruct the jury to disregard that answer.

Id. at 1250-51.  After the government's completion of its re-direct and the beginning of its direct examination of another witness, the trial concluded for the day.  I excused the jury then immediately informed the attorneys I wished to see them.

      THE COURT:  All right.  You may step down.

Page 13 - OPINION AND ORDER ON POST-TRIAL MOTIONS

I want to talk to you about the testimony that occurred regarding the Ayatollah Shirazi.[3]

At the pretrial conference, the ruling I gave you at that time was that the Government may refer to Shirazi and defendants' alleged support of him, may not mention Hezbollah without first alerting the Court.

At the time of testimony – I believe it was of Khalaji, the Iran expert, or at least at that time the issue was raised. I don't remember the exact question. I know that Mr. McCrum objected to the question. I overruled the objection at that point.

Now, today Mr. Gorder brought up the Ayatollah Shirazi. A question was asked, and the witness specifically referred to Hezbollah, a terrorist organization.

Now, I believe that that presents a problem, Mr. Gorder. You tell me why you thought it was appropriate, or was it something that the witness did without your knowledge?

MR. GORDER: Well, Your Honor, as I understood when we were talking about whether the door was opened, you told me to go ahead and ask my questions. And so I took that to mean that you were going to rule on them individually.

THE COURT: Well –

MR. GORDER: And maybe I misunderstood.

THE COURT: When are we talking about that I allegedly said, "The door is open. Go ahead and ask your question"?

Because the last thing I said is I granted the request of Mr. McCrum for an offer of proof before we proceeded. That occurred today.

MR. GORDER: Yes. But then you indicated that you would rule on this question by question. So that's what I was doing.

Maybe I'm misunderstanding Your Honor.

---

[3]Contrary to defendants' argument, I was not confronting the government because of any testimony from Gregory Gadawski. I was referring to Price's testimony about Hezbollah and this was the first opportunity to address it with the attorneys.

> THE COURT: I may have to get a transcript of this.
>
> Now, I did instruct the jury to disregard the testimony on this. But as I mentioned before, this is a significant piece of evidence, and I'm concerned about where we are on it.

Id. at 1295-96. I asked McCrum for his recollection. McCrum accurately reported the discussion and indicated he would consider moving for a mistrial. McCrum believed that "[e]ven after you instructed the jury, Judge, their looks were just ashen, the fact that terrorism had once again come out, that they were giving money to this Shirazi guy and that he was tied to terrorism. The look on the jury was just frozen in fear." Id. at 1296-97. After some additional discussion, I requested defense counsel to prepare some proposed instructions and concluded for the day.

The next day, defense counsel presented a motion for mistrial. I went through the transcript from the day before. The government indicated it understood at the time that it was to proceed question by question. I indicated my unhappiness, but denied the motion. I informed the parties I would give an instruction to the jury to disregard any statement regarding any connection between Ayatollah Shirazi and Hezbollah and that there is no connection. I also stated, "I don't agree with counsel that the jury was ashen. I checked with other people around here. Nobody seemed to think that the jury made a big deal out of this. But that's neither here nor there. It's somewhat prejudicial, but I think we can go forward with an instruction and with the testimony. There will be no discussion about connections with Hezbollah, period." Tr. 1309 (June 19, 2013).

c.     Remaining Witnesses

After Price had finished, Gregory Gadawski testified. Defendants object now to testimony by Gadawski about the khoms defendants paid to Ayatollah Shirazi. Tr. 1291 (June

18, 2013).  The questions were focused on the dates of the checks and the fact that the money

went to Ayatollah Shirazi, not what the ayatollah did with the money.  Defendants did not object

to his testimony at the time.

Defendants also object to a statement made by Agent Hector Villarreal from Homeland

Security Investigations, who testified on the third day of the trial that he was assigned to a group

which "conduct[ed] interviews of passengers or other people we had tied to potential terrorism

investigations.  I also would conduct passport fraud and visa fraud."  Tr. 375 (June 13, 2013).

The government confirmed, "Passport fraud and visa fraud investigations, I take it?"  Id.  The

government then asked how Agent Villarreal came in contact with Lahiji, and his answer was

that he was responding to a "duty call of unreported money."  Id.  When the government asked

why the agent was responding, he answered, "The – Mr. Lahiji was being investigated, I believe,

for money laundering, and there was some tie to a joint terrorism task force."  Id. at 375-76.  The

government explained it wanted to know about the incident at the airport, saying, "That's what

I'm interested in."  Id.  The agent then explained customs officers had found Lahiji carrying

$20,000 on an international flight, without having reported it.  At a break, defense counsel raised

the issue.  I reminded the attorneys there should be no "terrorist allegations or references that

indicate that somebody was involved in terrorist activities.  I think the parties know.  You can

make sure that your witnesses know they're not to get into those kinds of discussions, use those

kind of terms."  Tr. 480 (June 13, 2013).  I consider this exchange an episode of a witness

volunteering an answer and not evidence of prosecutorial misconduct.

### d.    Curative Instruction

After the government rested, I gave the following instruction to the jury:

All right.  Members of the jury, the Government has rested.  I want to give you an instruction at this point as to some testimony that occurred in the Government's case.

During the course of this trial, the Government elicited testimony of Ayatollah Shirazi's suspected support of Hezbollah.  You will recall the Court instructed you to disregard the testimony of Agent Price on that subject.

The Court instructs you that there is no evidence Defendants Lahiji or Vahid ever supported or had ties to Hezbollah or anything related to terrorism.

The issues in this case are whether Lahiji and Vahid had the criminal intent to willfully conspire with others to impede or impair the functions of OFAC and/or to impede or impair the functions of IRS in the collection of income tax or to willfully conspire to transfer funds from the United States to a place outside the United States with the intent to promote a violation of the presidential embargo against certain financial transactions with Iran.

I instruct you again, there is no evidence either defendant funded or otherwise supported Hezbollah, terrorism, or any other person or entity supporting terrorism.

That's the instruction to you regarding that testimony.

Tr. 1629 (June 20, 2013).

4.    Discussion and Conclusion

According to defendants, the government's "strategy was to profile the Lahijis as supporters of the Islamic Republic of Iran (a known state sponsor of terrorism) and of related religious leaders and terrorist organizations such as Hezbollah." Defs.' Reply 3.  Defendants concede the government never used the words terrorism or Hezbollah in its opening statement, but argue it characterized Iran as the Islamic Republic run by a theocracy of religious clerics, that the clerics were not just religious figures, and implied that by giving Ayatollah Shirazi religious dues, half of which he could use for any purpose, defendants were supporting the extremist government and terrorism.  Id. (citing Tr. 47 (June 12, 2013)).

Page 17 - OPINION AND ORDER ON POST-TRIAL MOTIONS

Contrary to defendants' recollection of the government's opening statement, the government said nothing untoward or inflammatory. The government's opening statement outlined the issues for the jury and, among other subjects, set out a purely factual background about Iran, its ayatollahs, and defendants' desire to accumulate wealth in the United States before returning to Iran. This background was later introduced through testimony and was relevant to the pending charges. See, e.g. Tr. 35 (June 12, 2013) ("But what the trial is really going to be about is buying a building in Iran, investing money in a bank in Iran, sending money to an ayatollah in Iran, getting a relative a job in Iran, and personal profit."). I permitted the government to include a picture of Ayatollah Shirazi on its demonstrative exhibit, commenting that it was "pretty standard stuff." Tr. 43 (May 28, 2013). Although defendants suggest the government's opening statement "encouraged the jury to panic, and to make decisions based upon fears and prejudices encouraged by the media every day," Defs.' Mot. 4, the jury actually took over two days to deliberate, demonstrating they carefully and methodically sifted through the evidence before convicting defendants.

Defendants contend the government implemented its strategy of painting them as extremists and terrorists by eliciting prejudicial testimony from several witnesses, including Mehdi Khalaji, Kimberly Price, Gregory Gadawski, and Hector Villarreal. I have already rejected the defendants' arguments about Gadawski and Villarreal. See supra sect. 3.c.

Defendants perceive Khalaji's testimony as going beyond that needed for the government to establish context for the embargo, but I disagree. While "appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial[,]" Khalaji offered no testimony of the kind the Ninth Circuit proscribes. United States v.

Nobari, 574 F.3d 1065, 1073 (9th Cir. 2009).  References to the defendants' national origin, predisposition testimony, or testimony relying on stereotypes are improper.  Id. at 1073-74.  Here, Khalaji explained for the jury some background about Iran, who the ayatollahs were since they were referenced in the evidence in the case, what "khoms" are, and how "khoms" are paid.  This testimony was intended to help the jury understand the evidence and was directly relevant to the crimes charged and not merely a means of prejudicing the jury against defendants.

Nevertheless, I agree with defendants that the government went too far in questioning Khalaji and Price, contrary to my directions, about Ayatollah Shirazi's support for Hezbollah.  However, Khalaji's testimony about any link between Ayatollah Shirazi and Hezbollah was very weak and I do not believe it had any prejudicial effect on the jury.  Agent Price's testimony was stronger, but the Court immediately instructed the jury to disregard the testimony.  United States v. Washington, 462 F.3d 1124, 1136 (9th Cir. 2006) ("A judge's prompt corrective action in response to improper comments usually is sufficient to cure any problems arising from such improper comments.").  Furthermore, unlike a generalized jury instruction, I issued a firm curative instruction informing the jury there was "no evidence either defendant funded or otherwise supported Hezbollah, terrorism, or any other person or entity supporting terrorism."  Tr. 1629 (June 20, 2013).  Defendants are unable to point to any factors supporting a finding of "overwhelming probability" that the jury was unable to follow this instruction.  Greer v. Miller, 483 U.S. 756, 766 n.8 (1987).  The government also very carefully avoided all improper references to Hezbollah or terrorism in its closing and rebuttal arguments.

Defendants, of course, dispute the strength of the case.  Although the government's case relied heavily on documents, as opposed to any live witnesses with first-hand knowledge,

defendants' own contemporaneous statements about the transactions at issue were persuasive

evidence of the government's theory that defendants were laundering money through the Child

Foundation to Iran for their own benefit, as I discuss in more detail below.

I reject defendants' attempt to liken the events in this case to the prosecution of Pete

Seda, which the Ninth Circuit characterized as a "tax fraud case that was transformed into a trial

on terrorism." United States v. Sedaghaty, 728 F.3d 885, 891 (9th Cir. 2013). In that case, the

government introduced evidence of videos showing Chechen mujahideen, religious edicts

regarding support for the mujahideen, referenced Osama Bin-Laden five times, jihad 32 times

over the course of the six-day trial, and informed the jury that the defendant had provided the

Qur'an to prisoners containing an appendix calling them to jihad, when he later worked to have

that appendix removed. Notably, although the Ninth Circuit reversed and remanded for a new

trial, it was not because of prosecutorial misconduct. The Ninth Circuit did comment that the

charges were not terrorism related, and that there is a "fine line separating necessary and

probative evidence of willful falsity from evidence that would cast Seda in the role of a terrorist

based on appeals to fear and guilt by association and thereby unduly prejudice the proceedings."

Id. at 917. I walked the fine line here by allowing the government to introduce evidence about

Iran and its government; I believe that the government only negligently, and not intentionally,

failed to follow my instructions on evidence related to Hezbollah. Further, the sheer amount of

terrorism-related evidence introduced in the Seda case distinguishes it from the case at hand, as

do the crimes charged here.

Defendants now submit a supplemental exhibit to their reply brief containing a telephone

conversation between Yasrebi and Iranshahi in which Iranshahi explains Ayatollah Shirazi

agreed to give 50% of the funds to Child Foundation children and 50% to another charity for

children.  They contend the government knew from this evidence that their donations were being

used for charity and not terrorism.  As a result, defendants suggest, there was no reason

whatsoever for evidence linking the ayatollahs and the Iranian government, how ayatollahs use

funds, or how Ayatollah Shirazi supports Hezbollah, except as a means of prejudicing

defendants.

Defendants concede they did not bring the transcript to my attention during trial.  In

addition, the communication occurred on October 8, 2006 when other evidence from other years

introduced in the case reflected that Ayatollah Shirazi could use the funds "at his discretion[.]"

Tr. 109 and Ex. 9 (2005 communication); see also Tr. 1140-42 and Ex. 92 (2007 communication

in which Yasrebi informed a third party that CF had given money to Ayatollah Shirazi, who in

turn "gave 40-50 percent of it to us and the other 50 percent, we gave to people he wants us to

[asks us to].");  Tr. 1142-44 and Ex. 93 (2007 conversation between CF board members

discussing potential for donations, with some ayatollahs requesting an allocation to Islamic

propaganda).  Indeed, among the "new evidence" defendants submitted is a declaration from

Iranshahi in which he states the agreement with Ayatollah Shirazi permitted Refah Kudak to use

"approximately half of the Lahijis' financial donations on Refah-e Koodak's charitable purposes

and spend the other half on other nonprofits identified by the Ayatollah but approved by Refah-e

Koodak."  Defs.' Ex. 11.  In short, I do not view the conversation as an indication that the

government knew the funds were being used for children and nevertheless attempted to link

defendants to terrorism.

After reviewing the evidence and argument, I find no reason to grant defendants' motion for a new trial on the basis of any government misconduct.

B.      New Evidence

Defendants also move for a new trial on the basis of new evidence.  They contend they have, since the trial, learned that the auditor who prepared financial audits for the Iranian branch of the Child Foundation, Refah Kudak, which the government introduced as co-conspirator statements, is now available to testify.  The auditor, Khossro Hadavi, lives in Iran and, according to defendants, was not available to testify previously.  Since the trial, defendants have learned he spends time in Canada and has now indicated his willingness to testify.  In addition, they have learned Refah Kudak commissioned an Independent Auditor's Objective Findings Report, which was produced on August 3, 2013.  They contend the new evidence undermines a central theme in the case–that they supposedly retained an interest in the Tehran house and the Karafarin bank account in violation of the Iranian embargo.

To be entitled to a new trial on the new evidence theory, defendants must prove the following:  "(1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial."  United States v. Hinkson, 585 F.3d 1247, 1264 (9th Cir. 2009) (en banc).  The government disputes both defendants' diligence in obtaining this information and the likelihood that it would result in acquittal.

1.    Diligence

Defendants contend Hadavi was outside the Court's subpoena powers and that nothing they could have done could have compelled Hadavi to testify about a current or former client.[4] They approached him as soon as they learned about the Independent Auditor's Objective Findings Report.  It was not until then that they found out the government's exhibits were mistranslated, and not the originals.  Defendants also contend they had no reason to believe the audit reports would be admissible, since the government had not identified a sponsoring witness.

I simply disagree with defendants that they acted diligently.  Defendants had ample opportunity to consider the possibility that the financial statements were admissible non-hearsay statements of co-conspirators.  As the government points out, the "manner and means" section of the Indictment noted defendants' funds were deposited in "financial accounts in Iran over which LAHIJI and VAHID retained an interest and control.  Some of the LAHIJI/VAHID funds were used to . . . establish new investments in Iran . . . [and the conspirators] ensured that there were periodic accountings for the funds held in Iran on behalf of LAHIJI and VAHID."  Indict. ¶ 15; see also Indict. Overt Act 58 (specifically referencing language in the 2007 Refah Kudak financial statement, which became Exhibit 126A).  In addition, the government informs me that it included the financial statements in the "hot documents" discovery notebook provided to defendants before May 2011.  If this was insufficient advance notice, defendants had the government's exhibit list, referencing the Refah Kudak audit reports, and the government's motion in limine to admit the statements under the government's theory, on April 29, 2013, a

---

[4]Defendants refer to Refah Kudak as both a former and a current client.  See Defs.' Mot. 12; Defs.' Reply 12.

month before the pretrial conference.  Defendants never indicated a need to delay the trial for the

reason that they were blind-sided and needed to contact Hadavi.  The government is correct that

had defendants notified me, I would have done whatever was in my power to ensure defendants

obtained the evidence they needed, had they provided reasonable justification for it.

In short, defendants had over two years to prepare for trial, were permitted travel to Iran

for lengthy periods of time on two occasions, and had family and friends associated with Refah

Kudak who could have approached Hadavi on defendants' behalf.  Although defendants suggest

he would not have testified because Refah Kudak was a former or current client, Hadavi does not

indicate in his declaration that he would not have testified had they approached him earlier and

defendants do not point to any evidence that the Child Foundation and Refah Kudak were being

uncooperative.  Instead, when defendants asked Hadavi, he agreed to testify.  See also Couch v.

United States, 409 U.S. 322, 335 (1973) ("no confidential accountant-client privilege exists

under federal law, and no state created privilege has been recognized in federal cases").

Defendants have failed to meet their burden of showing they acted diligently.

2.    Effect of the New Evidence on the Outcome at Trial

Defendants contend Hadavi prepared the financial audits in 2002, 2003, 2004, 2007, 2008

and 2009, and is the person familiar with Refah Kudak's finances and arrangements with its

donors.  They claim that without the financial footnotes in the audit reports Hadavi created, the

government would have had very little evidence of the embargo violation.  Hadavi has now

prepared an Independent Auditor's Objective Findings Report, attached to defendants' motion as

Exhibit 1.  Hadavi would testify that:  (1) the government relied on inaccurate English

translations of the financial statements; (2) the footnotes did not capture the intent of the parties,

which was that the house and bank account were to be used for charity; and (3) the government's expert, Gadawski, was wrong.  As a result, Hadavi's testimony would show defendants had no expectation they would receive any financial benefit from their contributions.

Defendants have provided no evidence of any alleged mistranslations of the financial audits.  They contend they had "no indication from the discovery that the financial audits used by the Government at trial were not originals, nor did the Government disclose such fact at trial." Defs.' Reply 14.  However, Hadavi does not indicate in his declaration that the translations were inaccurate, nor does the Independent Auditor's Objective Findings Report mention a translation problem.  Similarly, the letters defendants have introduced from a current Refah Kudak official to the three accounting firms which prepared the audit reports do not indicate a translation problem; rather, the official complains the statements "need further and more specified details, according to the contents of the mutual letters of agreement[.]"  Defs.' Ex. 4.  Finally, a cover letter introduced into evidence with at least one of the statements reported it was translated by "Ali Shamiati, Official English language translator to the Judiciary."  Ex. 126C-03.

Even with the new evidence, defendants have not met their burden of showing a new trial would "probably" result in acquittal of the embargo charges.[5]  The Independent Auditor's Report explicitly states it is limited to Refah Kudak's books, and does not consider events not recorded by Refah Kudak.  The new evidence does not speak to defendants' "khoms" to Ayatollah Shirazi. In addition, defense trial exhibits 663-663A reported one of the purposes of the Karafarin bank account was to create jobs in Iran, and the experts on both sides agreed that was a violation of the

---

[5]Since defendants do not argue the evidence goes to their conviction for defrauding the IRS, I do not discuss the evidence in that context.

embargo.  Tr. 613 (June 14, 2013); Tr. 1955 (June 21, 2013).  Finally, and most importantly, although the bank account and building transactions ultimately ended up on the Refah Kudak statements, a jury could reasonably conclude that those financial statements merely reflected defendants' own understanding of the transactions.  For example, the email communications from Vahid to Iranshahi describing the bank account as a "joint account" and reporting the Tehran building as due back on a date certain (Ex. 81), Yasrebi's communication to Vahid that she is "legally the owner of the [bank] account" (Ex. 84), Lahiji's email to Iranshahi explaining that $350,000 was to be paid to Vahid's mother (Ex. 100-02), and Iranshahi's email to Lahiji that Refah Kudak was obligated to him for the "following three items" and listing the Tehran office (Ex. 96) all suggest something more than "noncommercial" intent in sending money to Iran.  <u>See also</u> Gov't Resp. 16-17 (describing additional evidence).  The Tehran building is, apparently, still in defendant Lahiji's sister's name and was never transferred to Refah Kudak and defendants have given no credible reason why they never transferred the building to Refah Kudak.

In sum, defendants fail to meet their burden of showing the new evidence would probably result in acquittal.

C.    <u>Other "Interest of Justice" Arguments</u>

Defendants finally identify eight other categories of new evidence they believe show their contributions to Child Foundation were permissible non-commercial remittances under the law, and not a violation of the Iranian embargo.  Defendants do not seek to explain their lack of diligence with respect to the list of eight items, and their lack of diligence is not excused.  Furthermore, the exhibits are declarations from fugitive Iranshahi, defendants' relatives, and employees of Refah Kudak.  I question the value of this evidence when these are all interested

Page 26 - OPINION AND ORDER ON POST-TRIAL MOTIONS

parties, one of whom previously created false and backdated documents to submit to an auditor in the United States, and all of whom have not been subjected to cross-examination.  See United States v. Martinez, 924 F. Supp. 1025, 1028 (9th Cir. 1996) (court may evaluate the credibility of witnesses in a motion for new trial).  Accordingly, this allegedly "new" evidence would not "probably" result in acquittal.

## CONCLUSION

For the foregoing reasons, I deny defendants' Motion to Compel Disclosure and Witness Immunity [304] and Motion for New Trial [305].

IT IS SO ORDERED.

DATED this _____7[th]_____ day of November, 2013.


  /s/ Garr M. King
Garr M. King
United States District Judge